IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
JONESBORO DIVISION

J.P. MORGAN CHASE BANK, N.A.                         APPELLANT

v.                          Case No. 3:11-cv-00249-BRW (LEAD CASE)

DANIEL L. JOHNSON and
SUSAN D. JOHNSON                                     APPELLEES

---

J.P. MORGAN CHASE BANK, N.A.                         APPELLANT

v.                          Case No. 3:11-cv-00250-BRW

TRACY L. ESTES                                       APPELLEE

---

J.P. MORGAN CHASE BANK, N.A.                         APPELLANT

v.                          Case No. 3:11-cv-00251-BRW

TAMMY R. PEEKS                                       APPELLEE

---

APPEAL FROM THE UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF ARKANSAS
JONESBORO DIVISION

HONORABLE AUDREY R. EVANS
UNITED STATES BANKRUPTCY JUDGE

---

BRIEF OF APPELLEES
DANIEL L. JOHNSON, SUSAN D. JOHNSON, TRACY L. ESTES, AND TAMMY R. PEEKS

Scott E. Poynter (#90077)
Chris D. Jennings (#2006306)
William T. Crowder (#2003138)
Corey D. McGaha (#2003047)
EMERSON POYNTER LLP
500 President Clinton Avenue, Suite 305
Little Rock, Arkansas 72201
Telephone: (501) 907-2555
Facsimile: (501) 907-2556
scott@emersonpoynter.com
cjennings@emersonpoynter.com
wcrowder@emersonpoynter.com
cmcgaha@emersonpoynter.com

John G. Emerson (#2008012)
EMERSON POYNTER LLP
830 Apollo Lane
Houston, Texas 77058
Telephone: (281) 488-8854
Facsimile: (281) 488-8867
jemerson@emersonpoynter.com

Joel G. Hargis (#2004047)
CRAWLEY & DELOACHE, PLLC
533 W. Washington Avenue
Jonesboro, Arkansas 72401
Telephone: (870) 972-1127
joel@crawleydeloache.com

Kathy A. Cruz (#87079)
THE CRUZ LAW FIRM
1325 Central Avenue
Hot Springs, Arkansas 71901
Telephone: (501) 624-3600
Facsimile: (501) 624-1150
kathycruzlaw@gmail.com

Todd M. Turner (#92266)
Daniel O. Turner (#97179)
ARNOLD, BATSON, TURNER &
TURNER, P.A.
501 Crittenden Street
Post Office Box 480
Arkadelphia, Arkansas 71923
todd@abtt.com
dan@arnoldbatsonturner.com

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ……………………………………………………………... iii

JURISDICTIONAL STATEMENT ……………………..…………………………..… 1

STATEMENT OF ISSUES PRESENTED …………………………..……………………… 1

STANDARD OF REVIEW …………………………………………………………….. 2

STATEMENT OF THE CASE ……………………………………………………… 3

    *The Johnsons Case* …………………………………….…………… 3

    *The Peeks Case* ………………………………………………………….. 4

    *The Estes Case* ……………………..………………………………… 5

    *The Bankruptcy Proceedings* ……………………..……………………….. 5

SUMMARY OF ARGUMENT …………………………………………………… 6

ARGUMENT AND AUTHORITIES ……………………………………………… 7

  I.    At the time of the foreclosures, J.P. Morgan was not
authorized to do business in Arkansas as required by
the SFA …………………………………..…………………………… 9

      A.    The Bankruptcy Court did not clearly err
in finding that J.P. Morgan Chase stipulated
that it was not "authorized to do business" in
Arkansas as required by the SFA …………………………….…..……… 10

      B.    J.P. Morgan's status as a national bank chartered
by the Office of the Comptroller of the Currency
does not mean that it is authorized to do business
in Arkansas …………………………………………….……….. 12

      C.    The Wingo Act does not conflict with the SFA ………...…..…….…… 13

      D.    The plain meaning of the SFA is clear …………………...….………… 14

  II.    Foreclosure is not an enumerated banking activity,
or an incidental banking power; thus state statutes regulating
foreclosure are not preempted by the National Banking Act,
OCC rules and regulations or the Supremacy Clause of the
U.S. Constitution, Article VI, Clause 2 …………………….……..……… 17

A.    The Bankruptcy Court correctly concluded no federal
      law preempts the SFA …………………………………..……..…. 21

B.    No type of preemption is applicable here ……………………………. 23

III.   By not raising the issues in bankruptcy proceedings,
       J.P. Morgan waived its arguments that the SFA violates
       the Commerce Clause and the Bankruptcy Court deprived
       it of Due Process and none of the exceptions to this rule apply ……..………... 29

A.    J.P. Morgan's Commerce Clause and
      Due Process arguments do not present purely
      legal issues ………………………………………….......…………... 30

B.    The resolution of the Commerce Clause and
      Due Process issues are legal issues that cannot be
      resolved beyond any doubt ……………………….……..………… 33

C.    No plain miscarriage of justice will occur if the
      Court refuses to consider J.P. Morgan's
      Commerce Clause and Due Process issues ………………....………... 34

D.    The Bankruptcy Court did not violate bankruptcy
      procedure or deprive J.P. Morgan of Due Process by
      improperly rejecting the proof of claims ………………………………… 35

IV.    The Bankruptcy Court did not abuse its discretion in finding
       That Appeellees were entitled to attorney fees ………………………………… 36

CONCLUSION …………………………………………………………………………… 39

## TABLE OF AUTHORITIES

### CASES

*Abbot v. Am. Cyanamid Co.*,
  844 F.2d 1108(4th Cir. 1988) …………………………………………………… 24

*Anderson v. Sara Lee Corp.*,
  508 F.3d 181 (4th Cir. 2007) ………...……………………...……………….. 23-24, 26

*Aronson v. Quick Point Pencil Co.*,
  435 U.S. 151 (1978) ……………………….……………………………………….. 8

*Apex Oil Co. v. Artoc Bank & Trust (in Re Apex Oil Co.)*,
  297 F.3d 712 (8th Cir. 2002) …………………………...…………………………… 36

*Barnett Bank of Marion Cnty., N.A. v. Nelson*,
  517 U.S. 25 (1996) ……………………………………………………..……………… 28

*Bituminous Materials v. Rice County*,
  126 F.3d 1068 (8th Cir. 1997) ……………………………………………………… 31

*Bunch v. W.R. Grace & Co.*,
  555 F.3d 1 (1st Cir. 2009) …………………………………………..……………… 2, 10

*Central Hardware Co. v. Walker-Williams Lumber Co. (In re Spirit Holding Co., Inc.)*,
  214 B.R. 891 (E.D. Mo. 1997) …………………………..…………………..…...…… 2

*Cipollone v. Liggett Grp., Inc.*,
  505 U.S. 504 (1992) ………………………………………………………...…….. 24

*City of Charleston, S.C. v. A Fishermans Best, Inc.*,
  310 F.3d 155 (4th Cir. 2002) ……………………………………………….…… 24-26

*College Loan Corp. v. SLM Corp.*,
  396 F.3d 588 (4th Cir. 2005) …………………………………………..…………… 24

*Cuomo v. Clearing House Ass'n, LLC*,
  129 S. Ct. 2710 (2009) ………………………………………………………..……28

*Debold v. Case*,
  452 F.3d 756 (8th Cir. 2006)……………………………………...…………….2, 10, 12

*First State Bank of Crossett v. Fowler*,
　　427 B.R. 1 (W.D. Ark. 2010) …………………………………...…………………… 37

*Fix v. First State Bank of Roscoe*,
　　559 F.3d 803 (8th Cir. 2011) ………………………………………...……………..2, 10

*Gen. Motors Corp. v. Abrams*,
　　897 F.2d 34 (2d Cir. 1990) ………………………………...…………………… 24

*Great Western Resources LLC v. Bank of Arkansas*,
　　2006 U.S. Dist. Lexis 92237 (W.D. Ark 2006) ………………………………………18

*Hanners v. Giant Oil Co.*,
　　373 Ark. 418, 284 S.W. 3d 468 (2008) ……………...………………………………… 39

*Henson v. Fleet Mortgage Co.*,
　　319 Ark. 491, 892 S.W.2d 250 ……………………………….…………………… 20

*Hillsborough Cnty., Fla. v. Automated Med. Labs., Inc.*,
　　471 U.S. 707 (1985) ………………………………………….…………….. 26-27

*H&R Block E. Enters., Inc. v. Raskin*,
　　591 F.3d 718 (4th Cir. 2010) ………………………………….……………… 24

*In re Bumgarner*,
　　225 B.R. 327 (Bankr. D.S.C. 1998) ……………….……………………............. 37

*In re Hunter*,
　　203 B.R. 150 (Bankr. W.D. Ark. 1996)………………………………………… 36

*In re Johnson*,
　　460 B.R. 234 (Bankr. E.D. Ark. 2011)……………………….…………………17

*In re Southeast Arkansas Landfill, Inc.*,
　　981 F.2d 372 (8th Cir. 1992) ……………………………...……………… 32, 34

*International Longshoreman's Assn v. Davis*,
　　476 U.S. 380 (1986) ………………………………………………………… 21

*Jones v. Rath Packing Co.*,
　　430 U.S. 519 (1977) …………………………………….…………………… 8

*Kelly v. Crunk*,
　　713 F.2d 426, (8th Cir. 1983) …………………………………….………… 3, 30

*Krigel v. Sterling Nat'l Bank (In re Ward)*,

230 B.R. 115 (B.A.P. 8th Cir. 1999) …………………………………..………………… 3, 30

*Medtronic, Inc. v. Lohr,*
518 U.S. 470 (1996) …………………………………………………….………………… 23

*Miller v. FEMA,*
57 F.3d 687, (8th Cir. 1995) …………………………………………..………… 3, 30, 34

*Monday v. Canal Insurance Co.,*
348 Ark. 435, 73 S.W.3d 594 (2002) ……………….…...……………………………… 15

*Nationsbanc Mortg. Corp. v. Hopkins,*
82 Ark. App. 91, 114 S.W.3d 757 (Ark. App. 2003) …………………..……………… 38

*Nationsbank, N.A. v. Murray Guard, Inc.,*
343 Ark. 437, 36 S.W.3d 291 (2001) ……………………………………………….….. 15

*Ozark Gas Pipeline Corp. v. Arkansas Public Service Comm'n,*
342 Ark. 591(2000) ……………………………………………………………...………14

*Ray v. Atlantic Richfield Co.,*
435 U.S. 151 (1978) …………………………………………………………..………… 8

*Reynolds v. Pa. Higher Educ. Assistance Agency (In re Reynolds),*
425 F.3d 526 (8th Cir. 2005) …………………………………………………….……… 2

*Rice v. Sante Fe Elevator Corp.,*
331 U.S. 218 (1947) ………………………………………………………….………… 24

*S. Union Co. v. Mo. PSC,*
289 F.3d 503 (8th Cir. 2002) …………………………………………...………… 31

*Schotzman v. Berumen,*
363 Ark. 215, 213 S.W.3d 13 (2005) ……………………………………………….….. 10

*Stafford v. Ford Motor Co.,*
790 F.2d 702 (8th Cir. 1986) ……………………………...…………...……………… 29

*Teruya Bros., Ltd. v. Comm'r of Internal Opinion Revenue,*
580 F.3d 1038 (9th Cir. 2009) ……………………………..…………………… 2, 10

*TMF Tool Co. v. Siebegnartner,*
899 F.2d 584 (7th Cir. 1989) ……………………………………………...………… 2, 10

*Tri-State Fin., LLC v. Lovald*,
    525 F.3d 649 (8th Cir. 2008) ………………………………………..…………… 3, 36

*United Student Aid Funds, Inc. v. Espinosa,*
    130 S. Ct. 1367, 176 L. Ed. 2d 158 (U.S. 2010)………………….………………… 36

*U.S. Trustee v. Harris*,
    960 F.2d 74 (8th Cir. 1992)……………………………………………..…………… 3, 29

*Von Kerssenbrock-Praschma v. Saunders*,
    121 F.3d 373 (8th Cir. 1997) ………………………………………………...……… 29, 31

*Washington Hosp. v. White*,
    889 F.2d 1294 (3d Cr. 1989) ……………………………………………………… 2, 10

*Watkins v. Wells Fargo Home Mortg.*,
    631 F. Supp. 2d 776 (S.D. W. Va. 2008) ……………………………………...……….. 24

*Watters v. Wachovia Bank, N.A.*, 550 U.S. 1 (2007) ……………………….……………….. 24

*Wendover Fin. Servs. v. Hervey (In re Hervey)*
    252 B.R. 763 (B.A.P. 8th Cir. 2000)…………………………………….……… 2-3, 13, 29-34

*Williamson v. Mazda Motors of Am., Inc.*,
    No. 08-1314, slip op. at 5 (U.S. Feb. 23, 2011) ………………………….………… 26

*Wyeth v. Levine*,
    555 U.S. 555 (2009) ……………………………………………………… 23, 26-28

## STATUTES

Ark. Code Ann § 4-27-1501 ……………………………………………………….. 13, 19

Ark. Code Ann. § 4-27-1502 …………………………………………...…………… 14, 19

Ark. Code Ann. § 4-27-1503 ……………………………………...…………….. 9-10, 15-16

Ark. Code Ann. § 16-111-101 ………………………………………...……………….. 39

Ark. Code Ann. § 16-22-308 ………………………….…………………………… 6, 36-38

Ark. Code Ann. § 18-50-101, *et seq.*…………………………….……………………….. 1

Ark. Code Ann. § 18-50-102 …………………………………………...…………..... 6, 15-17

Ark. Code Ann.  § 18-50-103 ……………………………….……………………………. 16

Ark. Code Ann. § 18-50-116 . ……………………………..…………………………… 15, 20

Ark. Code Ann. § 18-50-117 …………………………..………. 1, 3, 5, 9-10, 14-17, 19-22, 32

11 USC § 1322 ………………………………………………………...….………… 35, 37

12 U.S.C. § 1, *et seq*.…………………………………………………..……………… 1, 6, 12, 18

12 U.S.C. § 24 (Seventh) ………………………………………………………… 12, 18, 24

12 U.S.C. § 93 …………………………………………………………………….. 29

12 U.S.C. § 371 …………………………………………………………...……… 29

12 U.S.C. § 1828(*o*) …………………………………………………….………… 29

28 U.S.C. § 158 …………………………………………………………………….. 1

30 U.S.C. § 1254 ………………………………………………………………….. 27

47 U.S.C. § 253 ………………………………………………………………….. 27

49 U.S.C. § 5125 ……………………………………………..……………………. 27

**RULES**

Federal Rule of Bankruptcy Procedure 3007 …………………………..……………………… 35

Federal Rule of Bankruptcy Procedure 7052 ……………………….…………………… 33, 35

Federal Rule of Bankruptcy Procedure 9023 ……………………….…………………… 33, 35

Federal Rule of Bankruptcy Procedure 9024 ……………………….…………………… 33, 35

**REGULATIONS**

12 C.F.R. § 34.2 …………………………………………………….……………….. 29

12 C.F.R. § 34.3 …………………………………………………….………………... 30

12 C.F.R. § 34.4 …………………………………………………….……………….. 29

**CONSTITUTION**

United States Constitution, art. VI, cl. 2 ……………………………………………………..22-23

**OTHER AUTHORITIES**

2003 Ark. Acts 1302, § 3 …………………………………………..………………………… 20, 23

2011 Ark. Acts 901, § 2 …………………………………………….………………………….. 16

Bank Activities and Operations; Real Estate Lending and Appraisals,
      69 Fed. Reg. 1,904, 1,911 (Jan. 13, 2004) …………………………………….....……… 24

## JURISDICTIONAL STATEMENT

A district court has jurisdiction to hear appeals from a bankruptcy court's final judgments, orders and decrees.  28 U.S.C. § 158(a).  This court, therefore, has jurisdiction over J.P. Morgan Chase Bank, N.A.'s (hereafter "J.P. Morgan") appeal from the United States Bankruptcy Court for the Eastern District of Arkansas' Opinion and Order Overruling Objections to Confirmation ("Mem. Op.") issued on September 28, 2011, by the Honorable Audrey R. Evans, in three chapter 13 bankruptcy cases: *In re Tracy Lea Estes*, No. 3:10-bk-1654, *In re Daniel Lynn Johnson and Susan Diane Johnson*, No. 3:10-bk-19119, and *In re Tammy Renae Peeks*, No. 3:11-bk-10602.

## STATEMENT OF ISSUES PRESENTED

The issues presented on appeal are:

1.     Whether the Bankruptcy Court erred in concluding that Appellant J.P. Morgan Chase Bank, N.A. was not authorized to do business in Arkansas, and not in compliance with the Arkansas Statutory Foreclosure Act's, § 18-50-101, *et seq.* ("the SFA") authorized-to-do-business requirement.

2.     Whether the Bankruptcy Court clearly erred in finding that J.P. Morgan stipulated that at the time of the respective foreclosure proceedings against Appellees' property, it was not "authorized to do business" in Arkansas as required by the SFA, more specifically, Ark. Code Ann. § 18-50-117.

3.     Whether the Bankruptcy Court erred in finding that the SFA's requirement that a person or entity be authorized to do business in the state is not preempted by the National Banking Act (or "NBA"), 12 U.S.C. § 1, *et seq.*

4.     Whether J.P. Morgan waived its Commerce Clause and Due Process claims by not raising them in the bankruptcy proceedings below and for the first time in this appeal.

5.      Whether the issue of Bankruptcy Court's abused its discretion in finding that Appellees were entitled to an award of attorney fees.

## STANDARD OF REVIEW

When a bankruptcy court's judgment is appealed to a district court, the district court acts as an appellate court and reviews the bankruptcy court's legal determinations de novo. *Fix v. First State Bank of Roscoe*, 559 F.3d 803, 808 (8th Cir. 2011).   The bankruptcy court's findings of fact are reviewed for clear error.  *Id.*  A district court must affirm the decision of a bankruptcy court if it is supported by law and the facts contained in the record.  *Central Hardware Co. v. Walker-Williams Lumber Co. (In re Spirit Holding Co., Inc.)*, 214 B.R. 891, 894 (E.D. Mo. 1997).

Subsidiary findings of fact on which the bankruptcy court bases its legal conclusions are reviewed for clear error.  *See e.g. Reynolds v. Pa. Higher Educ. Assistance Agency (In re Reynolds)*, 425 F.3d 526, 531 (8th Cir. 2005).   Factual inferences drawn from a stipulated record are also reviewed for clear error.  *Teruya Bros., Ltd. v. Comm'r of Internal Opinion Revenue*, 580 F.3d 1038, 1043 (9th Cir. 2009); *Bunch v. W.R. Grace & Co.*, 555 F.3d 1, 3 n.4 (1st Cir. 2009); *TMF Tool Co. v. Siebegnartner*, 899 F.2d 584, 588 (7th Cir. 1989).  Any ambiguity from a party's stipulation is also reviewed for clear error.  *Washington Hosp. v. White*, 889 F.2d 1294, 1299 (3d Cr. 1989).  A finding is clearly erroneous when, although there is evidence in support it, the reviewing court is left with a firm conviction that the bankruptcy court committed a mistake.  *See Debold v. Case*, 452 F.3d 756, 761 (8th Cir. 2006).

Issues never presented to the bankruptcy court and raised for the first time on appeal are ordinarily not considered by the reviewing court.  *Wendover Fin. Servs. v. Hervey (In re Hervey)*, 252 B.R. 763, 767 (B.A.P. 8th Cir. 2000).  This rule has been consistently applied in bankruptcy

matters on appeal.  *Id.*  Moreover, this rule also applies to constitutional issues, like J.P. Morgan's due process and commerce clause issues, not raised in the bankruptcy court, but for the first time on appeal.  *U.S. Trustee v. Harris*, 960 F.2d 74, 77 (8th Cir. 1992).

While three limited exceptions to this rule have been recognized, none apply here.  First, the Eighth Circuit has recognized an exception for "exceptional cases where the obvious result would be a plain miscarriage of justice or inconsistent with substantial justice."  *Wendover Fin. Servs.*, 252 B.R. at 767-68 (quoting *Kelly v. Crunk*, 713 F.2d 426, 427 (8th Cir. 1983) (per curiam).  Second, the Eighth Circuit has recognized an exception where the resolution of the legal issue is "beyond any doubt[.]"  *Wendover*, 252 B.R. at 768 (quoting *Miller v. FEMA*, 57 F.3d 687, 689 (8th Cir. 1995).  Third, courts apply an exception where the new issue "involves a purely legal issue as to which additional evidence would not affect the outcome.  No new evidence is necessary."  *Wendover*, 252 B.R. at 768 (quoting *Krigel v. Sterling Nat'l Bank (In re Ward)*, 230 B.R. 115, 119 (B.A.P. 8th Cir. 1999).

A decision regarding a bankruptcy court's award of attorneys fees is reviewed for an abuse of discretion.  *Tri-State Fin., LLC v. Lovald*, 525 F.3d 649 (8th Cir. 2008).  The bankruptcy court has broad power and discretion to award or deny attorney fees.  *Id.*

## STATEMENT OF THE CASE

The parties stipulated that at the time of the foreclosure proceedings J.P. Morgan was not "authorized to do business" as required by the SFA, Ark. Code. Ann. § 18-50-117.  *See*, Transcript of Hearing on Objections to Confirmation ("Transcript"), 7:1-8:4; Mem. Op., pp. 2-3.

### The Johnson Case

Chase Home Finance, L.L.C. ("Chase") initiated non-judicial foreclosure proceedings, through the SFA, against a property owned by Daniel and Susan Johnson.  On December 20,

3

2010, the Johnsons filed a Chapter 13 bankruptcy proceeding bringing that non-judicial foreclosure to a halt. In their bankruptcy case, the Johnsons filed a Chapter 13 plan listing Chase as a long-term secured creditor that was owed an arrearage of $7,485. On March 23, 2011, Chase filed the Johnson Objection to Confirmation claiming that the correct arrearage amount was $14,072.81. Chase filed a proof of claim in the case claiming a secured debt of $187,468.21. The secured debt included the $14,072.81 alleged arrearage and $1,380 of the arrearage was for foreclosure fees and costs. On July 4, 2011, Chase transferred the Johnson Proof of Claim to J.P. Morgan Chase Bank, N.A.

*The Peeks Case*

J.P. Morgan Chase Bank, N.A. initiated a non-judicial foreclosure proceeding, through the SFA, against property owned by Tammy Renae Peeks. To initiate the foreclosure process, J.P. Morgan granted Wilson & Associates, PLLC a limited power of attorney authorizing Wilson & Associates to conduct the foreclosure. J.P. Morgan only presented the limited power of attorney in the property records for the Peeks case, but J.P. Morgan's counsel at the bankruptcy proceedings, Wilson & Associates, represented to the Bankruptcy Court that a similar limited power of attorney was granted and recorded in the property records for each of the three cases involved here. On January 31, 2011, Ms. Peeks filed a Chapter 13 bankruptcy proceeding bringing the non-judicial foreclosure to a halt. On February 10, 2011, Ms. Peeks filed a proposed Chapter 13 plan that listed J.P. Morgan as a long-term secured creditor that was owed an arrearage of $7,500. On March 21, 2011, J.P. Morgan filed the Peeks Objection to Confirmation asserting that the correct arrearage amount was $10,089.19. J.P. Morgan filed a proof of claim in the Peeks case on July 13, 2011 claiming a secured debt of $133,172.09. The

4

secured debt included an arrearage of $9,516.72 and $2,400.02 of the arrearage was for foreclosure fees and costs.

*The Estes Case*

Chase Home Finance, L.L.C. initiated non-judicial foreclosure proceedings, through the SFA, against a property owned by Tracy L. Estes.  On September 8, 2010, Ms. Estes filed a voluntary petition for bankruptcy under Chapter 13, bringing that non-judicial foreclosure to a halt.  On September 21, 2010, Ms. Estes filed a proposed Chapter 13 plan listing Chase as a long-term secured creditor that was owed an arrearage of $8,000.   Chase filed the Estes Objection to Confirmation on October 20, 2010, asserting that the correct arrearage amount was $10,537.36. Chase filed a proof of claim in the Estes case on October 28, 2010, claiming a secured debt of $37,041.96, The secured debt included an arrearage of $10,509.36 and $2,706.56 of the arrearage was for foreclosure fees and costs.  On May 25, 2011, Chase filed an amended proof of claim adjusting the arrearage from $10,509.36 to $10,502.22.  On July 14, 2011, Chase transferred the Estses Proof of Claim to J.P. Morgan Chase Bank, N.A.

*The Bankruptcy Proceedings*

On July 14, 2011, the Bankruptcy Court held a consolidated hearing on J.P. Morgan's objections to the Appellees' respective Chapter 13 plans.  At the hearing, Appellees argued J.P. Morgan was not permitted to collect foreclosure costs and fees because it was not "authorized to do business" in Arkansas, because the SFA requires that any entity seeking to non-judicially foreclose to be "authorized to do business" in Arkansas.  Ark. Code Ann. § 18-50-117.  In response, J.P. Morgan argued it complied with SFA and that the NBA preempted the SFA.

The Bankruptcy Court took the matter under advisement.  On September 28, 2011, the Bankruptcy Court issued its Memorandum Opinion.  The Bankruptcy Court found that (1) the

parties stipulated that, at the time of the foreclosure proceedings, neither Chase nor J.P. Morgan was "authorized to do business in Arkansas" as required by the SFA, (2) that J.P. Morgan was not qualified to use the SFA when it initiated foreclosure proceedings against Appellees, (3) that Arkansas' Wingo Act, Ark. Code Ann. § 18-50-102, did not allow J.P. Morgan to initiate foreclosure proceedings under the SFA without meeting the SFA's authorized-to-do-business requirement, (4) that the SFA was not preempted by any federal law, including the NBA, and (5) that the Appellees were entitled to an award of attorney fees as the prevailing party under Ark. Code Ann. § 16-22-308.  On October 21, 2011, J.P. Morgan filed its notice of appeal in the bankruptcy proceedings.

## SUMMARY OF ARGUMENT

The Bankruptcy Court's overruling of J.P. Morgan's Objections to Confirmation of Appellees' Chapter 13 plans is well founded in the law and fact.  This Court should affirm her entire decision.

First, the Bankruptcy Court did not err in concluding that J.P. Morgan was not authorized to do business in Arkansas and, therefore, not in compliance with the SFA.

Second, the Bankruptcy Court did not clearly err in finding that J.P. Morgan stipulated it was not "authorized to do business" in Arkansas as required by the SFA.

Third, the Bankruptcy Court did not err in finding that the SFA's authorized-to-do-business requirement is not preempted by the NBA, 12 U.S.C. § 1, *et seq*.

Fourth, J.P. Morgan waived its Commerce Clause and Due Process claims by not raising them in the bankruptcy proceedings below and for the first time on appeal.

Fifth, the Bankruptcy Court did not abuse its discretion in finding that Appelles were entitled to attorney fees.

## ARGUMENT AND AUTHORITIES

*I believe that banking institutions are more dangerous to our liberties than standing armies.  If the American people ever allow private banks to control the issue of their currency, first by inflation, then by deflation, the banks and corporations that will grow up around the banks will deprive the people of all property until their children wake-up homeless on the continent their fathers conquered.*

--Thomas Jefferson, 1802.

We are in the midst of a foreclosure crisis in this country.  In scores of instances in Arkansas, Chase has availed itself of the remedies in the SFA.  Appellant J.P. Morgan. — not its borrowers — elected to use this state statutory scheme.  Now, astonishingly, J.P. Morgan claims that it did not have a duty to strictly comply with the law it selected, because the Arkansas law it chose to use is somehow "preempted" by federal law.

In Arkansas, a person who wishes to foreclose on collateral can do so either in court or non-judicially, through the SFA.  Since J.P. Morgan itself chose to use the SFA, it should have complied with the statute's requirements.  The fact that it failed to do so does not raise any issue of preemption—it simply demonstrates that Chase chose to ignore part of the law.

Preemption is akin to an affirmative defense, which is typically raised by a party who claims that a state law has been imposed against it *without its consent*.  Here, however, *J.P. Morgan is the party who purposely selected the state law in question.*  Chase even included language in its mortgage that would allow it to use the SFA.  *See* Appellees' Appendix, Exhibit A, p. 16, ¶ 22, Exhibit B, p. 16, ¶ 22, Exhibit C, p. 16, ¶ 22.  Then, it elected to use the SFA when it chose to seek a non-judicial foreclosure. J.P. Morgan could have filed for foreclosure in state court, provided proper notice to the borrower and then presented appropriate proof to a circuit judge to obtain a foreclosure.  J.P. Morgan, however, elected to bypass the judicial process and pursued a statutory foreclosure under the SFA as provided in its mortgage contract.

Having done so, it cannot now maintain that it was excused from complying with various provisions of the SFA because of some fictional, federal preemption of state foreclosure remedies.

J.P. Morgan begins its sixty-two page treatise by claiming that it may avail itself of the SFA (*See* pp. 4 – 19).   It then claims that it may disregard the SFA because the SFA is "preempted."  In other words, J.P. Morgan claims that it can pick and choose which portions of the SFA it will follow.

It is abundantly clear that no provision of the SFA treads on J.P. Morgan's ability to *exercise federally granted banking powers.*   In fact, there is no federal law, in the NBA or otherwise, that would govern a bank's foreclosure remedy.  Instead, such activities are governed exclusively by state law.   Indeed, J.P. Morgan cites no explicit language from federal law or regulations demonstrating any intent to preempt state law governing a foreclosure of real property.  Moreover, J.P Morgan fails to demonstrate what federal foreclosure law it believes should have been followed instead of the SFA.

The police powers of the states are not to be superseded by federal law or regulation absent a "clear and manifest" purpose to the contrary. *Ray v. Atlantic Richfield Co.*, 435 U.S. 151 (1978); *Jones v. Rath Packing Co.*, 430 U.S. 519 (1977).   Contract and real property law fall traditionally in the domain of state regulation.  *Aronson v. Quick Point Pencil Co.*, 440 U.S. 257 (1979). Since there is no "clear and manifest" preemptive federal laws which govern the processes of repossession of foreclosure, these actions are clearly governed by state law.  Simply put, J.P. Morgan should not be allowed to pick and chose what portions of the SFA it will follow when it avails itself of the SFA and forecloses on homes and real estate within the State of Arkansas.

8

I.      **At the time of the foreclosures, J.P. Morgan was not authorized to do business in Arkansas as required by the SFA.**

J.P. Morgan may choose one of two avenues to foreclose on an Arkansas property.  J.P. Morgan has the authority, via statute, to enforce their mortgages through a judicial foreclosure. J.P. Morgan may also use the SFA to non-judicially foreclose.[1]  Appellees simply argue that J.P. Morgan may not employ the SFA and non-judicially foreclose unless it fully and strictly complies with its unambiguous terms.

The SFA's unambiguous language requires that a national banking association, such as the J.P. Morgan, register and be authorized to do business in the State of Arkansas: "No person, firm, company, association, fiduciary, or partnership, either foreign or domestic, shall avail themselves of the procedures under this chapter unless authorized to do business in Arkansas." Ark. Code Ann. § 18-50-117.  Arkansas provides a statutory mechanism for a foreign entity to be authorized to do business in Arkansas: "A foreign corporation may apply for a certificate of authority to transact business in this state by delivering an application to the Secretary of State for filing."  Ark. Code Ann. § 4-27-1503(a).

According to the plain language of ACA § 18-50-117 *every* entity inside and outside Arkansas *must* be authorized to do business in Arkansas in order to statutorily foreclose. The Arkansas Supreme Court has repeatedly noted that any statute in derogation of the common law must be strictly construed.  *See Schotzman v. Berumen,* 363 Ark. 215, 224, 213 S.W.3d 13, 16 (2005).  Because Arkansas has a strong policy emphasizing the importance of strictly construing

---

[1] Not all states have a process for non-judicial foreclosures.  The SFA is a recent creation of the Arkansas General Assembly.  The state legislature could repeal the SFA and require all lenders to use the judicial process to foreclose on real property.  Neither J.P. Morgan nor any other national bank, could do anything to prevent a repeal of the SFA.  If, however, J.P. Morgan elects to bypass judicial foreclosures in favor of the SFA, it must strictly comply with the SFA.

our statutes, this Court should exercise it in this case as well with respect to the SFA. JP Morgan,

therefore, must be authorized to do business prior to statutorily foreclosing on property.  If J.P.

Morgan is not authorized to do business in Arkansas, it may still judicially foreclose.

**A.    The Bankruptcy Court did not clearly err in finding that J.P. Morgan was not "authorized to do business" in Arkansas as required by the SFA.**

When a bankruptcy court's judgment is appealed to a district court, the district court acts

as an appellate court and reviews the bankruptcy court's findings of fact for clear error.  *Fix*, 559

F.3d at 808 (8th Cir. 2011).  Factual inferences drawn from a stipulated record are also reviewed

for clear error.  *Teruya Bros.*, 580 F.3d at 1043 (9th Cir. 2009); *Bunch*, 555 F.3d  at 1, 3 n.4 (1st

Cir. 2009); *see also TMF Tool*, 899 F.2d at 588 (7th Cir. 1989).  Any ambiguity from a party's

stipulation is also reviewed for clear error.  *Washington Hosp.*, 889 F.2d at 1299 (3d Cir. 1989).

A finding is clearly erroneous when, although there is evidence to support it, the reviewing court

is left with a firm conviction that the bankruptcy court committed a mistake.  *See Debold*, 452

F.3d at 761 (8th Cir. 2006).

Here, the Bankruptcy Court found that:

> The parties stipulated that at the time of the foreclosure proceedings at issue in these cases, neither Chase nor J.P. Morgan was 'authorized to do business' in the state of Arkansas as required by § 18-50-117 of the Arkansas Statutory Foreclosure Act of 1987, Ark. Code Ann. §§ 18-50-101, *et seq.* (the **"Statutory Foreclosure Act"**).

Mem. Op., p. _____.  The Bankruptcy Court's finding is supported by the Transcript:

> MR. HARGIS:  Chase's counsel has stipulated that JP Morgan Chase, Chase Home Finance, LLC – no, Chase Home – it's – I mean Chase –
>
> MS. BURNETTE:  It's JP Morgan Chase Bank, N.A.
>
> MR. HARGIS:  -- N.A. is not a bank registered with the Secretary of State as an entity to conduct business in Arkansas and is not registered as an out of state bank doing business in Arkansas with the Arkansas Bank Department;  clarify that they

are not registered with either entity.  And because they have agreed graciously to stipulate to that, we have no witnesses to call beyond – they would – just testify as to those facts here.

THE COURT:  Okay.

MR. HARGIS:  So this will be argument only.

THE COURT:  Okay.

MS. BURNETTE:  Well, I have one other piece of evidence.  I guess I could attempt to offer that now.  It is a certified true copy of a limited Power of Attorney that was filed.  I brought it in the Peeks case because I was actually able to get it certified today over at the county courthouse – you know, certified as a true copy.  And this is a limited Power of Attorney that authorized Wilson & Associates to conduct the sale on that – on Ms. Peek's property under the Statutory Foreclosure Act.

THE COURT:  Okay.  I will accept that in –

MS. BURNETTE: I haven't shown that to him, but I will.

THE COURT: Okay.  And I'm accepting that into evidence as Exhibit No. 7.

*See*, Transcript, 7:1-8:4.  The Court's finding regarding the parties' stipulation is consistent with the stipulation recited at the hearing.  Further, Ms. Burnette, J.P. Morgan Chase's attorney at the hearing, gave no indication to the contrary.  Instead, she moved on to introducing the limited Power of Attorney authorizing Wilson & Associates to conduct the sale on Ms. Peek's property under the SFA.    Further, at no other time in the hearing, did Ms. Burnette address the stipulation, or attempt to clarify or withdraw it.  *See* Transcript, 8:19-10:2, 12:2-5, 23:16-24:15, 25:19-28:19.

Furthermore, Appellees would be prejudiced if the Court allows J.P. Morgan to back out of the stipulation that essentially turned the hearing to legal arguments regarding the SFA and preemption.   There is no mechanism on appeal to allow the Appellees to offer evidence that J.P. Morgan failed to strictly comply with the SFA.  Appellees did not offer this evidence at the

hearing because J.P. Morgan agreed to the stipulation.  J.P. Morgan's appeal to this Court cannot serve as a "do-over" simply because J.P. Morgan now wishes it had not entered into the stipulation.

The Bankruptcy Court did not clearly err by finding J.P. Morgan was not "authorized to do business" in Arkansas under the SFA, based upon the parties' stipulation.  Because there is evidence in the record supporting Judge Evans's finding of fact, the Court can have no definite and firm conviction that the bankruptcy court committed a mistake regarding the stipulation.  *See Debold*, 452 F.3d at 761 (8th Cir. 2006).  This Court should affirm the Bankruptcy Court's finding and give full effect to the stipulation.

> **B.      J.P. Morgan's status as a national bank chartered by the Office of the Comptroller of the Currency does not mean that it is authorized to do business in Arkansas.**

Nowhere in the NBA, 12 U.S.C. § 1, *et seq*, did Congress specifically enumerated that a national bank has the power to foreclose.  The NBA does grant national banks the power to exercise "all such incidental powers as shall be necessary to carry on the business of banking." 12 U.S.C. § 24 (Seventh).  Nowhere in this section is banking activity, in relation to debts, extended beyond the power to lend.  Notably, with the national banks' lending power, there is no mention of the banks authority to foreclosure or to collect debts.  Additionally no regulation or letter issued by the OCC expands these incidental powers to include foreclosure.  Laws and regulations regarding the retaking of property and collection of debts are generally left to the states.  As argued in the bankruptcy proceedings, foreclosure is a creature of common law - it is the divesting of the property interest of another.  *See* Transcript, p. 11:14-19.

Foreclosure is not banking activity.  J.P. Morgan assertions otherwise are not supported in any case law, statute, or regulation.  In other words, banks need not obtain a bank charter,

either from a state or under federal law, to foreclosure on an interest in property.  But J.P. Morgan's charter as a national bank issued by the OCC does not authorize them to do business in Arkansas for the purpose of using the SFA.  Again, the manner and requirements regarding how a state allows foreclosures to proceed fall well outside the purview of the NBA.

### C.      The Wingo Act does not conflict with the SFA.[2]

Fully aware of the NBA's scope, the Arkansas Legislature enacted the Wingo Act, a subdivision of the Arkansas Business Corporation Act, Ark. Code Ann § 4-27-1501.  The Wingo Act, requires foreign entities to "obtain[s] a certificate of authority from the Secretary of State." Ark. Code Ann. § 4-27-1501(a).  The Wingo Act exempts from such authorization the acts of "Securing or collecting debts or enforcing mortgages and security interests in property securing the debts[3]." Ark. Code Ann. § 4-27-1501(b)(8).  In addition to collecting debts and enforcing mortgages, the Wingo Act excludes various, unrelated activities.   *See* Ark. Code Ann. § 4-27-1501(b).  In other words, the Wingo Act applies generally to an array of business activities in its exclusionary provisions in subsection § 4-27-1501(b).

Because enforcing mortgages includes the non-banking act of foreclosure, entities attempting to foreclose are not required to comply with Ark. Code Ann. § 4-27-1502(a): "A foreign corporation transacting business in this state without a certificate of authority may not maintain a proceeding in any court in this state until it obtains a certificate of authority."

Because the Wingo Act involves such a wide range of activities, it is a statue of general application.  When there is a conflict between existing statutes the accepted rule of statutory

---

[2] In the bankruptcy proceedings, J.P. Morgan did not raise their argument that the NBA preempts the Wingo Act. Issues never presented to the bankruptcy court and raised for the first time on appeal are ordinarily not considered by the reviewing court.  *See Wendover Fin. Servs.*, 252 B.R. at 767 (B.A.P. 8th Cir. 2000). In fact, J.P. Morgan specifically defended its right to employ the SFA with the use of the WINGO Act.  *See* Transcript, pp. 26-28.

[3] Arkansas' legislature apparently believes that foreclosure, an act to enforce a mortgage, is not an act to collect a debt as it lists the two separately.

construction requires that the more general statute "yield" to the requirements of the more specific statute. *See Ozark Gas Pipeline Corp. v. Arkansas Public Service Comm'n*, 342 Ark. 591, 602 (2000). As the Bankruptcy Court held, the SFA controls a very specific type of foreclosure while the Wingo Act governs actions to enforce mortgages including judicial foreclosures. Under the Bankruptcy Court's correct interpretation, the Wings Act does not conflict with the SFA's authorized-to-do-business requirement in § 18-50-117. The Court, therefore, should affirm the Bankruptcy Court's finding that the Wingo Act does not contradict the SFA.

> **D.      The plain meaning of the SFA is clear.**

Having established that foreclosure is not banking activity and that the Wingo Act co-exists with the SFA, the clear language of § 18-50-117 can be applied to J.P. Morgan. Every entity, either foreign or domestic, must be authorized to conduct business in this state prior to statutorily foreclosing. This requirement extends to national banking associations like J.P. Morgan.

Unambiguous, clear statutes like the SFA do not require the Court to resort to any rules of statutory interpretation:

> If the language of a statute is clear and unambiguous and conveys a clear and definite meaning, there is no reason to resort to rules of statutory interpretation. If, however, the meaning of a statute is not clear, we look to the language of the statute, the subject matter, the object to be accomplished, the purpose to be served, the remedy provided, the legislative history, and other appropriate means that shed light on the subject. Statutes relating to the same subject are said to be *in pari materia* and should be read in a harmonious manner, if possible.

*Monday v. Canal Insurance Co.*, 348 Ark. 435, 440, 73 S.W.3d 594, 597 (2002). There is no necessity to resort to extrinsic material if the statute's words are plain:

The statute must be construed so that no word is left void or superfluous and in such a way that meaning and effect is given to every word therein, if possible. *Id.* If the language of a statute is clear and unambiguous and conveys a clear and definite meaning, there is no occasion for resorting to rules of statutory interpretation.

*Nationsbank, N.A. v. Murray Guard, Inc.*, 343 Ark. 437, 443-444, 36 S.W.3d 291, 295 (2001). The procedures set forth in the SFA apply only if the mortgagee or beneficiary is a mortgage company, bank, or savings and loan.  Ark. Code Ann. § 18-50-116.   Section 18-50-117 qualifies what banks, savings and loans and mortgage companies must do to avail themselves of the SFA. Section 18-50-117's provisions are not limited to mortgage companies as J.P. Morgan suggests. The Court should give each word of the SFA its proper meaning.  In that regard, "No person, firm, company, *association*, fiduciary, or partnership, either *domestic* or foreign . . ." includes J. P. Morgan.

Arkansas' legislature, moreover, simply used the phrase "authorized to do business," both in the SFA and in its Emergency Clause.   This phrase means exactly what it says - an entity must be authorized to conduct business in Arkansas.  Ark. Code Ann. § 4-27-1503 provides the instructions, as quoted above, for foreign entities conducting non-banking activity - in this case a national banking association.

As to Ark. Code Ann. § 18-50-102, the Bankruptcy Court correctly found that this section is also in harmony with the plain and clear language of § 18-50-117.  Section 18-50-102(a)(2) allows a "Bank or savings and loan association authorized to do business under the law of Arkansas or those of the United States," to qualify as a trustee to conduct the sale.  J.P. Morgan fails to point out that the statute places restrictions on the trustee or mortgagee before it may conduct the sale.  To suggest that the entities named in § 18-50-102 are not restricted by other provisions of the SFA is disingenuous.  Ark. Code Ann.  § 18-50-103 restricts the trustee

15

from conducting the sale except under certain specific requirements[4].  If a trustee does not meet the SFA's authorized to do business requirement, then the trustee cannot avail itself to the provisions of the SFA either.  Sections 18-50-102 and 117 are in harmony and neither renders the other meaningless.

J.P. Morgan argues that the Bankruptcy Court's interpretation means  "a bank or savings and loan association authorized to do business under . . . the laws of the United States' could not avail itself of the provisions of the SFA, and thus could not be a trustee."  That argument is faulty because the converse is true.  A national bank could qualify as a trustee under § 18-50-102 but not be authorized to do business under § 18-50-117.  The fix to this issue is amazingly and exceedingly simple – register with the Secretary of State to be authorized to do non-banking business in this State.

Additionally, the Bankruptcy Court correctly found that the recent additions to the Ark. Code Ann. § 18-50-102 evidence a desire by the Arkansas Legislature to limit access to the SFA:

> Further, the most recent enactment of Ark. Code Ann. § 18-50-102, now in effect, places several additional requirements on an attorney-in-fact before he can qualify as a party to a non-judicial foreclosure proceeding. In addition to the requirement that the attorney-in-fact be licensed in Arkansas (which was the law at the time of these foreclosure proceedings), an attorney-in-fact must now also have an office located in Arkansas, be accessible during business hours, and be able to accept funds as payment on the subject mortgage. *See* 2011 Ark. Acts 901, § 2, effective July 27, 2011. These recent additional restrictions to the attorney-in-fact qualification provide further evidence of the Arkansas legislature's intent to limit access to the Statutory Foreclosure Act, not to further broaden access to that process as J.P. Morgan's argument would necessarily require.

*In re Johnson*, 460 B.R. 234, 242 (Bankr. E.D. Ark. 2011).

J.P. Morgan argues that § 18-50-102's requirement that a trustee have a business location in Arkansas to foreclosure under the SFA evidences that the legislature did not intend a national

---

[4] J.P. Morgan does not object to the restrictions of Ark. Code Ann. § 18-50-103 as preempted under the NBA.

bank to be authorized to do business in Arkansas.  It argues that if Arkansas' legislature really intended that banks be authorized to do business in Arkansas then they would have stated it there as well.  The opposite is true.  Including such language in the new provisions of § 18-50-102 would have been redundant.  To require anything other than an office, which the NBA allows, would have overtaxed national banks with the added costs of opening a branch in this state.  To suggest that the legislature needed to "reassert" the authorization requirements of § 18-50-117 in § 18-50-102 is folly.  How many times and in how many ways does a state have to demand compliance with its existing laws?

Congress never intended the NBA as an "out" for national banks from state statutory requirements that do not impair their ability to foreclose on defaulted mortgages.  If Arkansas' legislature had not enacted the SFA, national banks like J.P. Morgan would foreclose judicially.  The Bankruptcy Court found, 40% of states do not allow statutory foreclosures.  To take J.P. Morgan's argument to its logical extent, because Arkansas enacted the SFA, without restricting judicial foreclosures, it cannot regulate those that employ the SFA.  J.P. Morgan's arguments allow Arkansas to open the door to banks using statutory foreclosures, but leaves Arkansas without the slightest control over the same banks.

**II.**    **Foreclosure is not an enumerated banking activity, or an incidental banking power; thus state statutes regulating foreclosure are not preempted by the National Banking Act, OCC rules and regulations or the Supremacy Clause of the U.S. Constitution, Article VI, Clause 2.**

Nowhere in the NBA, 12 U.S.C. § 1, *et seq*, did Congress specifically enumerate that a national bank has the power to foreclose.  The NBA does grant national banks the power to exercise "all such incidental powers as shall be necessary to carry on the business of banking." 12 U.S.C. § 24 (Seventh).  Neither the NBA, nor any federal regulation, nor any OCC material,

enumerates procedures regarding how a national bank can foreclose on a security interest in real property. *Great Western Resources LLC v. Bank of Arkansas*, 2006 U.S. Dist. Lexis 92237 (W.D. Ark 2006). Foreclosure procedures have been exclusively reserved to the states as statutes of general application. *Id.* Additionally, foreclosure is not reserved exclusively to national banks either as an enumerated banking activity or exclusively as an incidental power. National banks are not the only entities that have the legal authority to hold security interests in real property.

Every state has judicial foreclosure laws that allow any entity that holds a security interest in real property to foreclose on that security interest in the event of default. This is done by bringing a lawsuit in equity to terminate the obligee's interest and possession in the real property that is the collateral for the note or loan. All contracts entered into by national banks are subject to state law of the applicable jurisdiction. *Great Western Resources*, 2006 US Dist. Lexis 92237. The NBA does not preempt the state control regarding how those contracts are enforced in the state judicial system. *Id.* The Wingo Act, recognizes a national bank's right to access Arkansas courts and exempts national banks from having to obtain a certificate of authority to access Arkansas courts. Nothing in the NBA or in OCC rules and regulations usurps the power of the individual states to control their judiciary regarding foreclosures.

Until 1987, judicial foreclosure was the only Arkansas procedure available to any entity that sought to foreclose its security interest in real property once the underlying note was in default. On February 18, 1987, Arkansas enacted the SFA, Ark. Code Ann. § 18-50-101 *et seq*. The SFA allows foreclosures of secured interests in real property without judicial review. The SFA consisted of rules laying out procedures that must be followed to properly foreclose on a security interest in real property. Because no judicial review existed, Arkansas' legislature

18

restricted the SFA's use to banks, savings and loans, and mortgage companies.  These entities were also subject to strict requirements like content of notices, placement of notices, and who could conducts sales.  Further, written mortgages had to expressly authorize the use of the SFA so that the mortgagor contracted to waive their rights to due process and judicial review.  If the mortgagor refused to so waive, the alternative was to find other methods of financing that did not require such a waiver of due process rights.   *See* Act 1987, No. 53, § 1. Some, but not all states also have enacted some form of statutory foreclosures.   Other state acts contain similar restrictions.

On April 14, 2003, Arkansas' legislature amended the SFA to require that qualified entities also were required to do business in Arkansas.   Ark. Code Ann. § 18-50-117. The Arkansas legislature passed § 18-50-117 as an emergency act:

> It is found and determined by the General Assembly of the State of Arkansas that foreign entities not authorized to do business in the State of Arkansas are availing themselves to the provision of the Statutory Foreclosure Act of 1987, that oftentimes it is to the detriment of Arkansas citizens and that this act is immediately necessary because these entities should be authorized to do business in the State of Arkansas before being able to use the Statutory Foreclosure Act of 1987.   Therefore, an emergency is declared to exist, and this act being immediately necessary for the preservation of the public peace, health and safety shall become effective on (1) the date of its approval by the Governor....

Act 1303, Section 3 of Acts 2003.  Arkansas' legislature clearly invoked state police powers to protect the public peace, health and safety of its citizens.

Since the SFA is a statute in derogation of common law, it must be strictly complied with.  *Henson v Fleet Mortgage Co.*, 319 Ark. 491, 892 S.W.2d 250 (1995). An entity using the SFA to foreclose that did not strictly comply with the SFA has had its sale voided.  *Id.* In 2009, Arkansas' legislature codified the strict compliance requirement found in Arkansas case law for the SFA.  *See* Ark. Code Ann. § 18-50-116.

J.P. Morgan argues that the NBA, OCC rules and regulations, and U.S. Constitution's Supremacy Clause preempts the SFA.  Specifically, J.P. Morgan argues that §18-50-117 is preempted because the SFA interferes with its enumerated or incidental powers under the NBA and OCC rules and regulations.  As stated above, foreclosure is not an enumerated banking activity.  Foreclosure is not an exclusive banking activity because banks are not the only entities that take a security interest in real property.  Foreclosure, therefore, is not an incidental banking activity reserved only to national banks.  Federal laws, therefore, do not occupy the "entire field" of foreclosures.  Far from that notion, foreclosures have always fallen with the traditional police powers of the states.

Here, the mortgages require the use of the SFA, including § 18-50-117.   J.P. Morgan cannot now unilaterally exclude the application of § 18-50-117 here.   Federal preemption can be waived by contract.  *International Longshoreman's Assn v. Davis*, 476 U.S. 380 (1986).  By requiring the Appellees to submit to the SFA, J.P. Morgan also agreed to abide by the SFA.  J.P. Morgan did not object the SFA's restrictions, raise the preemption issue, or reserve any right to only comply with portions of the SFA.

J.P. Morgan made all the elections, selected the terms of the mortgage, the choice of law, the election of their remedy, and the Appellees' only choice was to accept or reject.  Contracts are construed against the drafter, and J.P. Morgan was in a superior position vis-a-vis the Appellees and cannot complain about the deal terms it made.

J.P. Morgan argues that because it is a national bank it is in strict compliance with § 18-50-117 because it already has authority to do business in Arkansas based on the NBA. Contrary to J.P. Morgan's allegations that it already has the authority required by § 18-50-117, it does not have a certificate of authority to do business in Arkansas.  It has only the authority

granted of a national bank under the NBA and the OCC and regulations, which obviously does not include the right to avoid the requirements of the SFA when J. P. Morgan avails itself to its provisions.

Further, the Arkansas legislature has acknowledged the NBA's restrictions on state power in the Wingo Act that does not subject national banks to Arkansas' certificate of authority requirement to access state courts, and thus, judicially foreclose.  It is, therefore, nonsensical to argue Arkansas' legislature knowingly placed an impermissible burden on national banks by requiring them to be authorized to do business in Arkansas before using the SFA.

J.P. Morgan controlled the entire mortgage process.  It elected to use the SFA.  It required a signed contract agreeing the SFA would apply.   It cannot now complain that it is unhappy with its own contract or choice, or argue that its preferred use of the SFA is preempted.  Such an application would require the debtors submit to the SFA, but allow J.P. Morgan Chase to wiggle out of its requirements when convenient.

### A.      The Bankruptcy Court correctly concluded no federal law preempts the SFA.

As decided by the trial court, none of these types of preemption apply to ACA 18-50-117. The concept of federal preemption originates in the U.S. Constitution's Supremacy Clause:

> This Constitution, and the Laws of the United States which shall be made in pursuance thereof; and all treaties made, or which shall be made, under the authority of the United States, shall be the supreme law of the land; and the judges in every state shall be bound thereby, anything in the constitution or laws of any state to the contrary notwithstanding.

U.S. Const. art. VI, cl. 2.

The Supreme Court has recently reemphasized two cornerstones of its preemption jurisprudence.  *Wyeth v. Levine*, 555 U.S. 555, 563-64 (2009).  First, the purpose of Congress is

the ultimate touchstone in every preemption case. *Id.* Although the text of the statute is the best evidence of Congress' purpose, the overall purpose of the statute can also demonstrate Congress' intent to preempt state law. *See Medtronic, Inc. v. Lohr*, 518 U.S. 470, 486 (1996). Second, courts considering federal preemption must assume federal law does not supersede the states' historic police powers unless Congress manifests a clear purpose to do so. *Wyeth*, 555 U.S. at 563-64 (2009). Federal courts' respect for the states as independent sovereigns in our federal system means they assume that Congress does not cavalierly preempt state law. *Id.* at 1195 n. 3.

The presumption against preemption is especially strong where preemption would apply to a field that the States have traditionally occupied, like protecting the health and safety of their citizens. *Anderson v. Sara Lee Corp.*, 508 F.3d 181, 192 (4th Cir. 2007). The SFA's emergency clause recites Arkansas' legislature passed the act to protect the "public peace, health and safety." Act 1303, Section 3 of Acts 2003. The presumption against federal preemption applies even in those areas long occupied by federal regulation. *Wyeth*, 555 U.S. at 565. The presumption against preemption accounts for the historic presence of state law, and is not dependent on the absence of federal regulation. *Id.*

Moreover, the presumption against preemption is amplified in certain other circumstances. For instance, courts are more reluctant to infer preemption from the comprehensiveness of regulations than from the comprehensiveness of statutes. *Abbot v. Am. Cyanamid Co.*, 844 F.2d 1108, 1112 (4th Cir. 1988). Additionally, the presumption against preemption is stronger against preemption of state remedies when no federal remedy exists. *See Anderson*, 508 F.3d at 192. In sum, in every preemption case, the court must identify some concrete evidence demonstrating that the clear and manifest purpose of Congress was to override state law. *Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 516 (1992).

Here, the Court should give the presumption against preemption full force.   Even though the federal government has regulated national banks for more than a century, preemption would displace state consumer-protection statutes, which fit squarely within the states traditional police powers to protect the well being of their own citizens.  *See, e.g.*, *Rice v. Sante Fe Elevator Corp.*, 331 U.S. 218, 230 (1947); *Gen. Motors Corp. v. Abrams*, 897 F.2d 34, 42-43 (2d Cir. 1990).

**B.      No type of preemption is applicable here.**

There are three manifestations of the preemption doctrine: field preemption, express preemption, and conflict preemption. *See H&R Block E. Enters., Inc. v. Raskin*, 591 F.3d 718, 722 (4th Cir. 2010).  Field preemption is a narrow category, applicable only where the federal scheme of regulation of a defined field is so pervasive that Congress must have intended to leave no room for the states to supplement it.  *City of Charleston, S.C. v. A Fishermans Best, Inc.*, 310 F.3d 155, 169 (4th Cir. 2002).

Congress and the OCC never intended to occupy the entire field of national banking regulation. To the contrary, Congress has always left national banks subject to state laws of general application in their daily business, *Watters v. Wachovia Bank, N.A.*, 550 U.S. 1, 11 (2007), and the OCC has explicitly disclaimed any desire to occupy the entire field of national banking, *see* Bank Activities and Operations; Real Estate Lending and Appraisals, 69 Fed. Reg. 1,904, 1,911 (Jan. 13, 2004); *see also Watkins v. Wells Fargo Home Mortg.*, 631 F. Supp. 2d 776, 783-85 (S.D. W. Va. 2008).

Express preemption arises when Congress has clearly expressed an intention to preempt state law.  *College Loan Corp. v. SLM Corp.*, 396 F.3d 588, 595-96 (4th Cir. 2005).  Nothing in the NBA or OCC regulations show that Congress intended to preempt state law requirements for statutory or non-judicial foreclosures.  The NBA contains no express preemption provision.

23

Instead, the NBA provides national banks with several broad powers and vests the OCC with the power to oversee national banks.   Pursuant to that framework, federal courts have long recognized that Congress' purpose in enacting the NBA was to shield national banking from unduly burdensome and duplicative state regulation.   Thus, national banks are subject to state laws of general application in their daily business to the extent such laws do not conflict with the letter or the general purposes of the NBA. In other words, the States may regulate the activities of national banks where doing so does not prevent or significantly interfere with the national bank's or the national bank regulator's exercise of its powers.   When, by contrast, state action significantly impairs the exercise of authority, enumerated or incidental under the NBA, the State's regulations must give way. Since its earliest formulation, the NBA has vested national banks with all such incidental powers as shall be necessary to carry on the business of banking. 12 U.S.C. § 24 (Seventh). Express preemption, clearly is not an issue here as it certainly cannot apply to the SFA.

Conflict preemption arises when Congress did not necessarily intend preemption of state regulation in a given area but the particular state law conflicts directly with federal law or stands as an obstacle to the accomplishment of federal objectives.  *A Fisherman's Best*, 310 F.3d at 169. Conflict preemption encompasses two subcategories.   First, it can arise when compliance with both federal and state regulations is a physical impossibility.   *Hillsborough Cnty., Fla. v. Automated Med. Labs., Inc.*, 471 U.S. 707, 713 (1985).   Second, conflict preemption can occur when state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress. *Id.*   The Fourth Circuit refers to this latter type of conflict preemption as obstacle preemption. *Anderson*, 508 F.3d at 192.

24

The Supreme Court recently refined the parameters of obstacle preemption. *See Williamson v. Mazda Motors of Am., Inc.*, _____ U.S. _____, 2011 U.S. LEXIS 1711 (U.S. Feb. 23, 2011). The *Williamson* Court emphasized obstacle preemption turns on an essential threshold showing that a significant objective of a federal regulation be identified. *Williamson*, 2011 U.S. LEXIS 1711, *6. The Court could not identify any such objective in *Williamson*, concluding instead that the policy choice set forth in the federal regulation did not represent a significant regulatory objective of Congress. *Id.* at *6, *16. Consequently, a state tort claim, even with the potential to constrict that choice, did not stand as an obstacle to the accomplishment of the full purposes and objectives of federal law and was not preempted. *Id.* at *22. Here, J.P. Morgan points to no federal regulatory objective regard a state's statutory foreclosure law. Additionally, it is not impossible for J.P. Morgan to obtain authorization to do business in Arkansas, but instead is fairly easy to do so. Clearly, no form of conflict preemption applies to the SFA.

Federal preemption can be implicated even where a statute is silent as to preemption. That concept often arises when an agency has spoken to the issue of preemption through the rulemaking process, an area of the law to which the Supreme Court recently brought some much-needed clarity. *See Wyeth* 555 U.S. at 574-581 (2009). In *Wyeth*, the Court articulated the precise level of deference that courts should apply to an administrative agency's views on preemption. *See id.*

The *Wyeth* Court outlined two distinct scenarios. The first arises where an agency regulation with the force of law preempts state law. *See id.* 555 U.S. at 574-75 (citing *Hillsborough*, 471 U.S. at 713). Where that is the case, courts are to conduct their own conflict preemption determination, relying on the substance of state and federal law and not on agency

proclamations of preemption. *Id,* 555 U.S. at 574-75. The Court offered three examples of agency regulations that bear the force of law necessary to preempt state law. *See id.* 555 U.S. at 576n.9 (citing 47 U.S.C. § 253(a), (d); 30 U.S.C. § 1254(g); 49 U.S.C. § 5125(d)). What is notable about these statutory provisions is that, unlike the NBA, each expressly mentions preemption. *See,* 47 U.S.C. § 253(d) (giving the FCC the power to preempt the enforcement of any inconsistent state or local requirement).  Although Congress conferred explicit rulemaking authority on the OCC in multiple portions of the NBA, Congress did not confer any preemptive rulemaking authority on the OCC.  Accordingly, the circumstances here do not fit within *Wyeth's* first scenario.

In the second scenario outlined in *Wyeth*, a court is faced with an agency's mere assertion that state law is an obstacle to achieving its statutory objectives.  555 U.S. at 574-75.  The question presented in *Wyeth* was what weight to give to the agency's views in that context. The Court explained that it had never deferred to an agency's conclusion that state law is preempted. *Id*.  It had only attended to an agency's explanation of how state law affects the regulatory scheme. *Id.*  The Court summarized the weight to be given to an agency's views on preemption as follows:

> While agencies have no special authority to pronounce on preemption absent delegation by Congress, they do have a unique understanding of the statutes they administer and an attendant ability to make informed determinations about how state requirements may pose an obstacle to the accomplishment and execution of the full purposes and objectives of Congress. The weight we accord the agency's explanation of state law's impact on the federal scheme depends on its thoroughness, consistency, and persuasiveness.

*Id.* (internal quotation marks and citations omitted). The OCC's preemption regulation represents the agency's attempt to describe how various categories of state law stand as an obstacle to the purposes and objectives embodied in the NBA. Given that context, therefore, it is only appropriate to accord the OCC's preemption analysis *Skidmore* deference. *See Wyeth*, 555 U.S. at 576-77.

The fact that the Supreme Court applied *Chevron* deference to an OCC regulation in *Cuomo v. Clearing House Ass'n, LLC*, 557 U.S. 519, 129 S.Ct. 2710 (2009), is not controlling here. The *Cuomo* Court actually ruled that the OCC's interpretation was not entitled to *Chevron* deference. *See Cuomo* 129 S. Ct. at 2719. More importantly, *Cuomo* (like *Watters*) concerned § 484(a) of the NBA, which has been read by the Court as a preemption provision. *See id.* 129 S. Ct. at 2715. Thus, *Cuomo* is distinguishable from the circumstances presented here, *i.e.*, where the court is faced with the OCC's declaration of preemption in the context of statutory silence. *Cuomo* 129 S. Ct. at 2732 (Thomas, J., concurring in part and dissenting in part) (The preemption of state enforcement authority [under § 484(a)] . . . thus follows from the statute itself not agency action).

Conflict preemption has always been ensconced in the NBA's regulatory scheme, because the NBA's statutory grants of authority, whether specifically enumerated or merely incidental to other powers, have been universally understood as not being limited by, but rather ordinarily preempting, contrary state law. *Barnett Bank of Marion Cnty., N.A. v. Nelson*, 517 U.S. 25, 32 (1996). Thus, when the OCC first promulgated a distinct preemption regulation in 1984, it was not promulgating a wholly new preemption provision, but rather was attempting to summarize and distill existing conflict preemption precedent. *See* 12 C.F.R. § 34.2 (1984). By 1996, the OCC had further clarified its preemption analysis, but it continued to emphasize that it

27

was simply applying existing principles of conflict preemption. In fact, the OCC's preemption regulation noted that the agency would apply recognized principles of federal preemption in considering whether State laws apply to other aspects of real estate lending by national banks. 12 C.F.R. § 34.4(b).

To complement the broad powers granted to national banks, Congress conferred equally broad rulemaking authority on the OCC, primarily in § 371(a), which subjects national bank real estate lending to such restrictions and requirements as the OCC shall prescribe. Furthermore, the NBA confers explicit rulemaking authority on the OCC to prescribe rules and regulations to carry out the responsibilities of the office. 12 U.S.C. § 93(a). And in yet another portion of the statute, Congress directed the appropriate federal banking agencies (including the OCC) to adopt uniform regulations governing real estate lending. *See* 12 U.S.C. § 1828(*o*). Of critical importance, however, is that none of these various statutory provisions mentions or even directly hints at preemption.

Effective February 12, 2004, the OCC promulgated the current version of the preemption regulation, which provides that state laws that obstruct, impair, or condition a national bank's ability to fully exercise its federally authorized real estate lending powers do not apply to national banks. 12 C.F.R. § 34.4(a). The regulation states that national banks may make real estate loans without regard to state law limitations concerning fourteen categories of law. *Id.* None of those subject areas covering processing, origination, servicing, sale or purchase of, or investment or participation, in mortgages, is at issue here. *Id.* § 34.4(a)(10). The regulation also sets forth a savings clause, stipulating that state laws on certain enumerated subjects are not inconsistent with the real estate lending powers of national banks and apply to national banks to the extent they only incidentally affect the exercise of national banks' real estate lending powers.

*Id.* Included on § 34.4(b)'s list of non-preempted areas are state laws on contracts, torts, criminal law, and any other law the effect of which the OCC determines to be incidental to the real estate lending operations of national banks or otherwise consistent with the powers and purposes set out in § 34.3(a). *Id.* Here, the Bankruptcy Court did not err if finding that no federal legislation preempts the SFA's authorized-to-do-business requirement. This Court, therefore, should affirm her ruling on preemption in full.

**III.    By not raising the issues in bankruptcy proceedings, J.P. Morgan waived its arguments that the SFA violates the Commerce Clause and the Bankruptcy Court deprived it of Due Process and none of the exceptions to this rule apply.**

Issues never presented to the bankruptcy court and raised for the first time on appeal are ordinarily not considered by the reviewing court. *Wendover Fin. Servs.*, 252 B.R. at 767 (B.A.P. 8th Cir. 2000). The *Wendover* Court observed that this rule has been consistently applied in bankruptcy matters on appeal. *Id.* This rule applies to constitutional issues, like J.P. Morgan's due process and commerce clause issues, not raised in the bankruptcy court, but instead for the first time on appeal. *Harris*, 960 F.2d at 77.

Two reasons underpin the rationale of the rule that precludes a reviewing court from considering issues raised for the first time on appeal. Both reasons are implicated here. First, the record on appeal generally would not contain the findings necessary to evaluate the validity of the appellant's arguments. *Von Kerssenbrock-Praschma v. Saunders*, 121 F.3d 373, 375-76 (8th Cir. 1997) (quoting *Stafford v. Ford Motor Co.*, 790 F.2d 702, 706 (8th Cir. 1986)). Second, there is an inherent injustice in allowing an appellant to raise an issue for the first time on appeal. *Id.* Here, the record on appeal contains no findings concerning the Commerce Clause and Due Process issues raised by J.P. Morgan before this Court, for the first time. Appellees will show below how considering these issues now, for the first time, will prejudice them.

While three limited exceptions to this rule have been recognized, none apply here.  First, the Eighth Circuit has recognized an exception for "exceptional cases where the obvious result would be a plain miscarriage of justice or inconsistent with substantial justice."  *Wendover Fin. Servs*, 252 B.R. at 767-68 (quoting *Kelly v. Crunk*, 713 F.2d 426, 427 (8th Cir. 1983) (per curiam).  Second, the Eighth Circuit has recognized an exception where the resolution of the legal issue is "beyond any doubt[.]"  *Wendover Fin. Servs.*, 252 B.R. at 768 (quoting *Miller v. FEMA*, 57 F.3d 687, 689 (8th Cir. 1995).  Third, courts have applied an exception where the new issue "involves a purely legal issue as to which additional evidence would not affect the outcome.  No new evidence is necessary."  *Wendover*, 252 B.R. at 768 (quoting *Krigel v. Sterling Nat'l Bank (In re Ward)*, 230 B.R. 115, 119 (B.A.P. 8th Cir. 1999).

### A.     J.P. Morgan's Commerce Clause and Due Process arguments do not present purely legal issues.

J.P. Morgan did not argue that that SFA violated the Commerce Clause in the bankruptcy proceedings.  *See* Transcript.  Neither did J.P. Morgan argue that the Bankruptcy Court violated bankruptcy procedures and thereby deprived it of Due Process.

To support its arguments, JP Morgan's falsely asserts that its attorney in the bankruptcy proceeding was ambushed at the hearing.   In truth, JP Morgan's bankruptcy counsel engaged in telephone calls and email exchanges with the Appellee's attorney vetting the legal arguments to be presented at the hearing.   J.P. Morgan's attorney was fully aware of the arguments to be argued in the case below, as she stated: "Based on discovery responses received from two of the debtors, and based on what we've just agreed to, Chase anticipates that the debtors will argue that the foreclosure fees in the claims should be disallowed because under Arkansas law Chase is not authorized to conduct business -- I'm – is not authorized to conduct a foreclosure proceeding in Arkansas."  Transcript, 9:16-22.

J.P. Morgan attempts to justify its raising the Commerce Clause issue for the first time on appeal by arguing it is a purely legal issue.  This is not the case.  As the Eighth Circuit has pointed out, in order for J.P. Morgan to establish the SFA violates the Commerce Clause it must meet a "substantial burden to prove that" the SFA "resulted in an unconstitutional burden on interstate commerce."  *S. Union Co. v. Mo. PSC*, 289 F.3d 503, 509 (8th Cir. 2002); *see also Bituminous Materials v. Rice County*, 126 F.3d 1068, 1072 (8th Cir. 1997).  J.P. Morgan offered no proof in the bankruptcy proceedings that shows the SFA place an unconstitutional burden on interstate commerce.   Whether a state-statute violates the Commerce Clause is not a "purely legal issue," and therefore, does not fall into the exception to the rule that issues never presented to the bankruptcy court and raised for the first time on appeal are ordinarily not considered by the reviewing court.  *Wendover Fin. Servs.* 252 B.R. at 767 (B.A.P. 8th Cir. 2000).

J.P. Morgan points to no evidence in the record to demonstrate that the SFA violates the Commerce Clause because it offered no proof and made no such argument in the bankruptcy proceedings.  Instead, it requests this Court make an attempt to address its Commerce Clause issue in a "factual vacuum."  *See Von Kerssenbrock-Praschma*, 121 F.3d at 376.  Appellees request this Court decline to do so, just as the *Von Kerssenbrock-Praschma* and *Wendover Fin. Servs.* courts declined.  *Id.*; *Wendover Fin. Servs.*, 252 B.R. at 768.  Addressing these issues for the first time on appeal deprives the Appellees of any opportunity to introduce evidence addressing the Commerce Clause and Due Process arguments for the first time on appeal.  *See Wendover Fin. Servs.*, 252 B.R. at 768.

If the Court entertains J.P. Morgan's Commerce Clause arguments, it is easy to see the SFA does not discriminate against foreign entities.   The SFA's authorized-to-do-business

requirement applies to both foreign and domestic entities that wish to statutorily foreclose.  Ark.
Code Ann. § 18-50-117.

Even if the Court were to entertain J.P. Morgan Chase's Commerce Clause arguments
and hold that the SFA facially discriminated against out-of-state entities like J.P. Morgan, the
debtors would then have the opportunity to prove otherwise.  *See In re Southeast Arkansas
Landfill, Inc.*, 981 F.2d 372 (8th Cir. 1992). The only injustice that would occur if these
arguments are considered would be to the Appellees because it has had no opportunity to offer
evidence of harm.  *Id.; see also Wendover Fin. Servs.*, 252 B.R. at 768.  An appeal is simply not
the time to present wholly new claims.  Even still, it is hard to fathom how J.P. Morgan and other
out-of-state entities are harmed by the SFA, when those same entities can simply choose to
judicially foreclose rather than use the SFA.  More importantly, however, the plain language of
ACA § 18-50-117 does not facially discriminate as its provisions apply equally to "domestic or
foreign" entities seeking to avail themselves of the SFA.

J.P. Morgan failed to assert in the bankruptcy proceedings its claims that the SFA
violated the Commerce Clause and that the Bankruptcy Court was somehow depriving it of due
process due to the manner in which it ruled on the objections to confirmation.  *See* Transcript
The only evidence offered at the hearing were J.P. Morgan's proof of claims, the Chapter 13
plans, and a limited Power of Attorney authorizing Wilson & Associates to conduct the
foreclosure sale on Ms. Peeks' property under the SFA.  *Id.* at pp. 3, 6-7.  None of this evidence
comes close to establishing a Commerce Clause violation.   At the end of the hearing, the
Bankruptcy Court took the matter under advisement.  *Id.* at p. 30.  Sixty-six days later, the
Bankruptcy Court issued its Memorandum Opinion and Order Overruling Objections to

Confirmation.  *See* Document 12-1.  In the interim, J.P. Morgan did nothing to bring the Commerce Clause or Due Process issues to the Bankruptcy Court's attention.

Once the Court issued its Memorandum Opinion, J.P. Morgan did not avail itself of any post-judgment remedies allowed by the Federal Rules of Bankruptcy Procedure like seeking amended or additional findings, a new hearing, an altered or amended judgment or order, a reopening of the case, or the reconsideration of the order.  *See*, Federal Rules of Bankruptcy Procedure 7052, 9023, or 9024.

Additionally, the Bankruptcy Court would have been in a better position than this Court to determine whether the way it conducted the hearing on the objections to confirmation violated J.P. Morgan's Due Process.  The Bankruptcy Court deals with the Federal Rules of Bankruptcy Procedure daily; this Court does not.  But, instead presenting this issue to the Bankruptcy Court and obtaining a ruling, one way or the other, on its Due Process claim, J.P. Morgan presents the issue for the first time, here, on appeal.

Appellees request the Court find that J.P. Morgan has forfeited its right to argue that the SFA violates the Commerce Clause and that the Bankruptcy Court deprive it of Due Process based on the culmination of J.P. Morgan's failures to present its Commerce Clause and Due Process claims to the bankruptcy court, to offer evidence at the hearing to establish these claims, and to avail itself of post-judgment remedies available under the Federal Rules of Bankruptcy Procedure.  *See Wendover Fin. Servs.*, 252 B.R. at 769.

> **B.**     **The resolution of J.P Morgan's Commerce Clause and Due Process arguments are not legal issues that can be resolved beyond any doubt.**

It appears that the issue of whether state statutes like Arkansas' SFA that require out-of-state entities be authorized to do business in Arkansas violate the Commerce Clause is an issue of first impression.  No federal or state court has squarely addressed the issue.  The issue,

therefore, is far from one that can be resolved beyond any doubt.  The second exception to the general rule that issued raised for the first time on appeal should not be considered does not apply.  *Wendover*, 252 B.R. at 768 (quoting *Miller v. FEMA*, 57 F.3d 687, 689 (8th Cir. 1995)).

> **C.     No plain miscarriage of justice will occur if the Court refuses to consider J.P. Morgan's Commerce Clause and Due Process issues.**

As demonstrated above, the only miscarriage of justice or prejudice that will occur if the Court considers J.P. Morgan's Commerce Clause and Due Process arguments is to the Appellees. Such consideration would deprive the Appellees of any opportunity to present evidence that the SFA does not harm out-of-state entities like J.P. Morgan, which it is allowed to due according to the Eighth Circuit.  *See In re Southeast Arkansas Landfill, Inc.*, 981 F.2d 372 (8th Cir. 1992).

Even if the Court considers allowing J.P. Morgan to pursue this argument for the first time on appeal, it is simply beyond belief that it has suffered harm at the hands of the SFA. Entities like J.P. Morgan Chase can choose to judicially foreclose or use the SFA.

Not all states offer statutory foreclosure.  J.P. Morgan Chase has no right to statutorily foreclose on its mortgages unless a state legislature gives it such ability by statute.  In fact, the State of Arkansas gives out-of-states entities like J.P. Morgan two choices in how to carry out foreclosures, the SFA (which simply requires that the out-of-state entities are authorized to conduct business in Arkansas) or judicial foreclosure.  Where is the harm in having two foreclosure avenues to follow?  Tellingly, J.P. Morgan makes no mention of its option to judicially foreclose in its Commerce Clause argument.

Additionally, there is no "miscarriage of injustice" in refusing to consider these issues. Sixty six days passed between the hearing date and the Bankruptcy Court's Memorandum Opinion and Order Overruling Objections to Confirmation without J.P. Morgan attempting to bring these issues to the Bankruptcy Court's attention or to reopen the record.  The bankruptcy

proceedings would have been a better place to argue that the Bankruptcy Court somehow violated J.P. Morgan's Due Process rights in the way it carried out the ruling on the objections to confirmation rather than waiting to assert the Due Process issue on appeal to a U.S. District Court.

Once it received the Bankruptcy Court's order, it could have attempted to use a number of post-judgment remedies to put forth its argument and any evidence in support.    During that time, J.P. Morgan made no effort to reopen the proceedings to make its Commerce Clause or Due Process arguments.   *See*, Federal Rules of Bankruptcy Procedure 7052, 9023, or 9024.  This Court is well within the law to look at the cumulative effect of J.P. Morgan setting on its hands constitutes a waiver of its Commerce Clause and Due Process arguments.   *See Wendover Fin. Servs.*, 252 B.R. at 769.

> **D.    The Bankruptcy Court did not violate bankruptcy procedure or deprive JP Morgan of Due Process by improperly rejecting the proof of claims.**

JP Morgan attempts to confuse the issue before this Court when it argues that the Bankruptcy Court improperly rejected the proof of claims by citing to Bankruptcy Rule 3007(a). While an objection to claim may have been available, there is no requirement that an issue regarding a claim cannot be resolved through an objection to confirmation.  As argued at the hearing, pursuant to 11 USC § 1322(e), the Court is required to look to the "underlying agreement [here a mortgage] and applicable non-bankrutpcy law."  As Appellees argued below, the arrearage to repay through the plan did not purport to cover all JP Morgan claimed as arrearages.   Pursuant to § 1322(e), the Court found that JP Morgan was not entitled to reimbursement of foreclosure fees for a foreclosure that did not confirm with non-bankruptcy law.

A confirmed plan controls over the amount of the debt claimed in a proof of claim. *United Student Aid Funds, Inc. v. Espinosa*, ____ U.S. ___, 130 S. Ct. 1367, 176 L. Ed. 2d 158 (U.S. 2010). As such, the objection to confirmation was sufficient in reducing the amount owed on JP Morgan's claimed arrearages that included the unlawful statutory foreclosure fees and costs. Finally, JP Morgan is incorrect in asserting that the Bankruptcy Court rejected its proofs of claim. In fact, the Bankruptcy Court's order denies JP Morgan's objection to confirmation and says nothing about its claim being rejected.

Again, because the notice/due process issue is not a purely legal issue and does require the development of an evidentiary record, the Appellees would be prejudiced if this Court were to entertain the question for this first time on appeal.

**IV.  The Bankruptcy Court did not abuse its discretion in finding that Appellees were entitled to attorney fees.**

A decision regarding a bankruptcy court's award of attorney fees is reviewed for an abuse of discretion. *Tri-State Fin., LLC v. Lovald*, 525 F.3d 649 (8th Cir. 2008). The bankruptcy court has broad power and discretion to award or deny attorney fees. *Id.* The amount of attorney fees awarded by a bankruptcy court is also reviewed under an abuse of discretion standard. *Apex Oil Co. v. Artoc Bank & Trust (in Re Apex Oil Co.)*, 297 F.3d 712, 717 (8th Cir. 2002).

Here, the Bankruptcy Court determined that Appellees were entitled to attorney fees pursuant to Ark. Code Ann. § 16-22-308, which provides an exception to the general "American rule" that litigants pay their own attorney fees. Mem. Op. 22; s*ee In re Hunter*, 203 B.R. 150, 151 (Bankr. W.D. Ark. 1996). The Bankruptcy Court has yet to determine the amount of attorney fees that Appellees are entitled to.

The Bankruptcy Court acted well within its discretion in awarding attorney fees pursuant to Ark. Code Ann. § 16-22-308.  That section provides for an award of fees in a civil action on, among other things, a promissory note:

> In any civil action to recover on an open account, statement of account, account stated, promissory note, negotiable instrument, or contract relating to the purchase of sale of goods, wares, or merchandise, or for labor or services, or breach of contract, unless otherwise provided by law or the contract which is the subject matter of the action, the prevailing party may be allowed a reasonable attorney's fee to be assessed by the court and collected as cots.

The Bankruptcy Court found that the Appellees brought the action to determine whether they owed the foreclosure fees and costs incurred by J.P. Morgan in conducting non-judicial foreclosure proceedings on its promissory notes.  *See* Mem. Op. p. 22.  The Appellees prevailed, and the Bankruptcy Court awarded fees under § 16-22-308.  *Id.*

J.P. Morgan makes a strained interpretation of § 16-22-308.  It argues that there are no breach of contract claims present in these cases and cites to an incomplete statement by the Bankruptcy Court: "[t]he only question in each of these three cases is whether the foreclosure fees and costs are allowed by the controlling law." Mem. Op., p. 5.  This statement is taken out of context.   The Court actually states, in whole, as follows:

> The question before the court is whether the Debtors owe J.P. Morgan the foreclosure fees and costs listed on its proofs of claims.  The Bankruptcy Code allows a debtor in a Chapter 13 bankruptcy case to cure a default on a debt for its home mortgage through the plan.  11 U.S.C. §§1322(b)(3),(5).  In order for that plan to be confirmed, a debtor must pay the default arrearage amount in full.  The amount owed in order to cure a default is "determined in accordance with the underlying agreement and applicable nonbankruptcy law."  11 U.S.C. §1322(e).  This determination poses two separate inquiries: first, what fees and costs are allowed by the agreement between the parties, and second, what fees and costs are allowed by applicable law.  *See In re Bumgarner,* 225 B.R. 327, 328 (Bankr. D.S.C. 1998).
>
> In these cases, there is no dispute that the foreclosure fees and costs are owed under the parties' agreements because the instrument used to create each debt gives J.P. Morgan "the right to be paid back by me for all of its costs and

expenses in enforcing this Note…." The only question in each of these three cases is whether the foreclosure fees and costs are allowed by the controlling law.

*See* Mem. Op., p. 5.

The United States District Court for the Western District of Arkansas has already rejected J.P. Morgan's argument.  *See First State Bank of Crossett v. Fowler*, 427 B.R. 1 (W.D. Ark. 2010).  The Court also distinguished *Nationsbanc Mortg. Corp. v. Hopkins,* 82 Ark. App. 91, 114 S.W.3d 757, (Ark. App. 2003), which J.P. Morgan relies on here:

> This case is distinguishable from *Nationsbanc,* because the plaintiffs in that case brought a cause of action pursuant to a statute and possible negligence on the part of the bank.  Furthermore, Appellee did not bring a claim pursuant to a statute or a claim of negligence against First State Bank, but rather argued that First State Bank had violated the promissory note when they failed to release the lien on Appellee's property after full payment of the debt. The Court agrees with the bankruptcy courts that, "[t]here are no allegations of negligence or violations of a statute in the case at bar, rather this action was brought because of alleged failure to abide by the terms of the promissory note. This is the type of action § 16-22-308 was designed to cover." Therefore, the Court finds no error in the bankruptcy court's ruling for attorney's fees for Appellee.

*Id.* (internal citations omitted).   Similarly, the underlying determination here was based on whether or not the fees claimed were allowed under the note and mortgage contracts.  Without the existence of the note and mortgage, J.P. Morgan would have no claim against the Appellees at all.  To argue that this case is based on anything other than J.P. Morgan's rights under those contracts is disingenuous.

Appellees challenged J.P. Morgan's attempt to collect its fees and costs for a non-judicial foreclosure through the Appellees' respective Chapter 13 plans.   J.P. Morgan, therefore, must have been requesting an award of its fees and costs based on either § 16-22-308 or on the Appellees' underlying contracts. Specifically, in all three of Appellees' mortgages with J.P. Morgan state: "If the default is not cured on or before the date specified in the notice, Lender at

its option may require immediate payment in full of all sums secured by this Security Instrument without further demand *and may invoke any other remedies permitted by Applicable Law*." *See* Appellees' Appendix, Exhibit A, p. 16, ¶ 22, Exhibit B, p. 16, ¶ 22, Exhibit C, p. 16, ¶ 22. J.P. Morgan originally requested an award of its fees arising from the objections to confirmation it filed in the above styled bankruptcy cases. *See* Appellees' Appendix, Exhibit D, p. 2, ¶ 3, Exhibit E, p. 2, ¶ 4, Exhibit F, 2. 16, ¶ 4. J.P. Morgan's argument against an award of fees and costs to the Appellees must fail. It cannot claim that it should be awarded fees under this statute, but that the Appellees cannot.

Finally, J.P. Morgan's reliance on *Hanners v. Giant Oil Co.,* 373 Ark. 418, 284 S.W. 3d 468 (2008) is also distinguishable. In *Hanners,* the Arkansas Supreme Court overturned an attorneys' fee award where a suit under Ark. Code Ann. §16-111-101, *et seq.,* sought a declaratory judgment regarding an oil-and-gas lease. The suit made no claim for damages. As demonstrated above, the matter contested below was whether the Appellees' Chapter 13 plans were paying the full amount of arrears as claimed by J.P. Morgan on its proof of claim, which were its alleged damages due based on the mortgage contracts. To such an end, the Bankruptcy Court did not abuse its discretion by ordering that Appellees' would be awarded attorneys' fees.

## CONCLUSION

In sum, J.P. Morgan attempts to use the federal preemption defense in reverse by availing itself to non-judicial foreclosure provisions and procedures of the SFA, even contract for it, but then say federal preemption allows it to pick and choose the provisions of the SFA it will follow. Such an argument is nonsensical, and clearly a strained and erroneous interpretation of the law as demonstrated above. For the reasons discussed in this memorandum, the Court should affirm the Bankruptcy Court's decision in full.

Dated: February 13, 2012.

Respectfully submitted,

/s/ Corey D. McGaha
Scott E. Poynter
Chris D. Jennings
Will T. Crowder
Corey D. McGaha
EMERSON POYNTER LLP
500 President Clinton Ave., Ste 305
Little Rock, AR 72201

John G. Emerson (08012)
EMERSON POYNTER LLP
830 Apollo Lane
Houston, TX 77058
Phone:  (281) 488-8854
Fax:  (281) 488-8867

Joel Hargis
CRAWLEY DELOACHE & HARGISJOE
533 West Washington
Jonesboro, AR 72401

Kathy A. Cruz
THE CRUZ LAW FIRM
1325 Central Avenue
Hot Springs, AR 71901

Todd Turner
Dan Turner
ARNOLD, BATSON, TURNER &
TURNER, P.A.
501 Crittenden Street
P.O. Box 480
Arkadelphia, AR 71923

COUNSEL FOR PLAINTIFF

**CERTIFICATE OF SERVICE**

I certify that on February 13, 2012, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which shall send notification of such filing to all attorneys of record.


 _/s/ Corey D. McGaha_____